UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LARRY G. PHILPOT,

    Plaintiff,

v.                            Case No. 8:20-cv-1239-VMC-TGW

MYAREA NETWORK, INC.,

    Defendant.
_____/

## <u>ORDER</u>

This matter comes before the Court upon consideration of Defendant MyArea Network, Inc.'s Motion for Summary Judgment (Doc. # 51) and Plaintiff Larry G. Philpot's Motion for Partial Summary Judgment (Doc. # 53), both filed on May 5, 2021. The Motions have been briefed. (Doc. ## 56, 62, 65). For the reasons that follow, MyArea's Motion is denied, and Philpot's Motion is granted in part and denied in part as set forth below.

## I.   <u>Background</u>

### A.   <u>MyArea</u>

According to the affidavit of Scott Conlon, president and CEO of MyArea, MyArea is a public social media platform which allows users to independently post information, commentary, and news about their community. (Doc. # 51-1 at

1

Conlon Aff. at ¶ 2). However, MyArea at times hires independent contractors to upload content to MyArea's websites. (Doc. # 53-1 at Conlon Dep. at 31:11-32:10, 44:18-25).

MyArea's "mission is, in part, to support local residents and businesses to create synergy between individuals and their community." (Doc. # 51-1 at Conlon Aff. at ¶ 3). MyArea "was created as a platform for local residents to report stories, commentary, and news about local businesses, events, resources, and organizations." (Id. at ¶ 4). "To further its mission, [MyArea] owns and operates the websites www.727area.com ('727 Website') and www.512area.com ('512 Website')." (Id. at ¶ 5). "The 727 Website and 512 Website are free online media platforms designed to allow users to freely post commentary, news, and content about local entertainment, events, businesses, and resources to the public." (Id. at ¶ 6). MyArea does not charge website visitors for access to the 727 Website or the 512 Website. (Id. at ¶¶ 7, 8).

But MyArea is also a commercial entity — it is a "marketing and technology business" that "utilize[s] the technology platform that [it has] built and provide[s] those services and solutions to small and medium-sized businesses."

(Doc. # 53-1 at Conlon Dep. at 11:6-12:6). While MyArea "does not publish articles or posts on the 727 Website or the 512 Website to directly generate profit" (Doc. # 51-1 at Conlon Aff. at ¶ 9), it indirectly profits from advertising revenue generated from views of articles on the websites. (Id. at ¶¶ 17, 24; Doc. # 53-1 at Conlon Dep. at 30:21-31:10).

**B.** **Philpot**

Philpot retired from General Motors in 2002. (Doc. # 60-1 at Philpot Dep. at 9:4-15). Philpot has worked as a freelance photographer since approximately 2008. (Id. at 11:9-22). The only type of photography that Philpot does professionally is photography of musicians in concert. (Id. at 29:20-24; Doc. # 1 at ¶¶ 1, 12). Philpot is not a member of any photography related professional associations. (Doc. # 60-1 at Philpot Dep. at 8:21-24).

Philpot's last business-related photography engagement occurred in approximately September or October of 2019. (Id. at 14:18-23). He was not paid for this photography engagement or for any of the photographs from his last business-related photography engagement. (Id. at 16:7-17:8). In fact, during his deposition, Philpot was unsure of the last time he was compensated for photographs he has taken. (Id. at 17:9-19).

Rather, the last time Philpot could recall getting paid for his photography was when he pursued another infringement enforcement action. (Id. at 17:17-25). During his deposition, Philpot could not recall any instances in which he was paid for his photographs outside of alleged infringement actions. (Id. at 18:1-12, 19:4-15). The majority of Philpot's compensation for his photographs has come primarily from pursuing enforcement actions related to his rights under his copyrights and Creative Commons Licenses ("CCL"). (Id. at 19:23-20:4, 38:24-39:9). But, according to his declaration, Philpot has also "been paid a license fee for [his] photography" through a stock photography agency. (Doc. # 53-1 at Philpot Decl. at ¶ 3).

Philpot also offers many of his photographs for free use on the free photo-sharing website, Wikimedia Commons ("Wikimedia"), subject to CCLs. (Id. at ¶¶ 13-25). Philpot posted the two photographs at issue in this case, the Nelson photograph and the Santana photograph, onto Wikimedia, subject to CCLs. (Doc. # 60-1 at Philpot Dep. at 41:19-23, 49:18-21, 68:12-16; Doc. # 1 at ¶¶ 26, 30). Many people have used the Nelson and Santana photographs in accordance with the CCLs by providing proper attribution. (Doc. # 56-1 at Philpot Decl. at ¶¶ 2-3). According to his declaration, the

attribution required by the CCLs provides Philpot with "monetary value in the form of advertising." (Doc. # 53-1 at Philpot Decl. at ¶ 24).

Philpot's purpose behind uploading his photographs, including the Nelson photograph and the Santana photograph, onto the Wikimedia website was to market his freelance photography, and to eventually display his photographs to get more access to concerts and more recognition. (Doc. # 60-1 at Philpot Dep. at 52:12-19).

Philpot believes that his work has value because it is able to get him access into events and more recognition. (Id. at 77:22-78:1, 80:10-12). He also believes that his photographs have monetary value. (Id. at 25:20-21).

**C.  Nelson Photograph**

The Nelson photograph shows Willie Nelson performing in concert at a Farm Aid event in 2009. (Doc. # 60-1 at Philpot Dep. at 36:7-16, 65:12-15, Ex. 1).

Philpot testified during his deposition that his purpose in taking the Nelson photograph was to depict "a great moment in time" and "to capture [Nelson's] personality." (Id. at 36:20-24). But, according to his declaration, Philpot created the Nelson photograph "to identify Willie Nelson." (Doc. # 53-1 at Philpot Decl. at ¶ 7). Philpot emphasizes the "several

5

creative decisions, including selecting the subject matter,
angle of photography, exposure, composition, framing,
location, and exact moment of creation," he made in taking
the Nelson photograph. (Id. at ¶ 8). When Philpot took the
photograph, he did not have plans to sell or license it. (Doc.
# 60-1 at Philpot Dep. at 12:13-18, 13:14-19).

Philpot first displayed the Nelson photograph on
Wikimedia. (Doc. # 1 at ¶ 26; Doc. # 53-1 at Philpot Decl. at
¶ 13). The Nelson photograph was available on Wikimedia
subject to a CCL. (Doc. # 60-1 at Philpot Dep. at 41:19-23;
Doc. # 53-1 at Philpot Decl. at ¶ 13). The CCL granted by
Philpot does not require users to provide monetary
compensation for the use of the Nelson photograph, but rather
allows anyone to use the Nelson photograph for free subject
to certain requirements. (Doc. # 60-1 at Philpot Dep. at 43:7-
17). Under the CCL that Philpot granted as to the Nelson
photograph, one of the requirements for use obligated
licensees to attribute Philpot as the photograph's creator.
(Id.; Doc. # 53-1 at Philpot Decl. at ¶ 14).

At his deposition, Philpot did not know how many times
he has licensed the use of or given permission for the use of
the Nelson photograph to anyone via the CCL. (Doc. # 60-1 at
Philpot Dep. at 53:6-10, 77:16-21). However, there is

evidence the Nelson photograph has been used permissibly by others under the CCL many times. (Doc. # 56-1 at Philpot Decl. at ¶¶ 2-3). According to his declaration, Philpot also offers to license the Nelson photograph for $3,500. (Doc. # 53-1 at Philpot Decl. at ¶ 37). Philpot did receive approximately $5,000.00 for the Nelson photograph from another third-party who used the image without permission somewhere between 2014-2016. (Doc. # 60-1 at Philpot Dep. at 18:12-19:3).

On October 4, 2016, MyArea published an article entitled "Willie Nelson Comes Home to Austin City Limits Music Festival" on the 512 Website. (Doc. # 51-1 at Conlon Aff. at ¶ 11; Doc. # 51-1 at Ex. C). The Austin City Limits article was written by Alex Koch to report on the Austin City Limits Music Festival event coming to Austin. (Doc. # 51-1 at Conlon Aff. at ¶ 12; Doc. # 7-9). Although Conlon did not know during his deposition whether Koch was an independent contractor for MyArea (Doc. # 53-1 at Conlon Dep. at 16:9-17:6), Conlon averred in his affidavit that MyArea did not pay Koch for the Austin City Limits article. (Doc. # 51-1 at Conlon Aff. at ¶ 13).

The article listed details surrounding the Austin City Limits Music Festival at Zilker Park in Austin, Texas. (Doc. # 51-1 at Ex. C; Doc. # 7-9). The Austin City Limits article

contained images of Willie Nelson and discussed Nelson's expected performance at the event and also commented on Nelson's being a Texas native. (Id.). The Austin City Limits article did not contain any commentary or criticism of the Nelson photograph itself. (Doc. # 53-1 at Philpot Decl. at ¶ 33; Doc. # 53-1 at Conlon Dep. at 25:19-26:20). Rather, according to Conlon, the purpose of the article and its use was "for news reporting and commentary on issues of public concern." (Doc. # 51-1 at Conlon Aff. at ¶¶ 2, 3, 4, 6, 10; Doc. # 53-1 at Conlon Dep. at 23:13-21, 29:17-18, 29:22-30:4, 140:18-23; 143:3-18).

Philpot learned of MyArea's display of the Nelson photograph on May 30, 2017. (Doc. # 60-1 at Philpot Dep. at 56:3-11; Doc. # 53-1 at Philpot Decl. at ¶ 26). But Philpot did not request MyArea to take down the Nelson photograph nor contact MyArea about its display of the Nelson photograph. (Doc. # 60-1 at Philpot Dep. at 56:17-24, 57:8-58:12). MyArea first received notice of the alleged infringement of the Nelson photograph upon receipt of the complaint in this case in May 2020. (Doc. # 51-1 at Conlon Aff. at ¶ 14). "Immediately upon learning of the alleged infringement of the Nelson photograph, [MyArea] removed the image of Willie Nelson from the 512 Website." (Id. at ¶ 15).

MyArea has never charged a visitor to the 512 Website for access to the Austin City Limits article. (Id. at ¶ 16). From October 4, 2016, through May 29, 2020, MyArea generated $10.63 in revenue from advertisements run on the webpage displaying the Austin City Limits article. (Id. at ¶ 17).

### D.   Santana Photograph

The Santana photograph shows Carlos Santana performing in concert in Indianapolis, Indiana in 2010. (Doc. # 60-1 at Philpot Dep. at 44:4-15, Ex. 4). Philpot testified during his deposition that his purpose in taking the Santana photograph was to capture "a great moment in time." (Id. at 47:24-48:2). Also, in his declaration, Philpot avers that he created the Santana photograph "to identify Carlos Santana." (Doc. # 53-1 at Philpot Decl. at ¶ 16). Philpot emphasizes the "several creative decisions, including selecting the subject matter, angle of photography, exposure, composition, framing, location, and exact moment of creation," he made in taking the Santana photograph. (Id. at ¶ 17).

Philpot first displayed the Santana photograph on Wikimedia in October 2013. (Doc. # 1 at ¶ 30). The Santana photograph was available on Wikimedia subject to a CCL. (Doc. # 60-1 at Philpot Dep. at 49:18-21, 68:12-16). The CCL granted by Philpot does not require users to provide monetary

compensation for the use of the Santana photograph, but rather allows anyone to use the Santana photograph for free subject to certain requirements. (Id. at 50:15-20). Under the CCL, one of the requirements for use obligated licensees to attribute Philpot as the creator of the photograph. (Id. at 50:5-20).

At his deposition, Philpot did not know how many times he has licensed the use of the Santana photograph to another individual or business via the CCL. (Id. at 53:24-54:1). Still, the Santana photograph has been used permissibly by others under the CCL many times. (Doc. # 56-1 at Philpot Decl. at ¶¶ 2-3). The only money Philpot has received from the Santana photograph is the result of settlement of copyright infringement claims. (Doc. # 60-1 at Philpot Dep. at 50:21-51:5).

In April 2019, MyArea displayed an event page entitled "Santana at Al Lang Stadium" on its 727 Website. (Doc. # 51-1 at Conlon Aff. at ¶ 18; Doc. # 51-1 at Ex. D). The Santana at Al Lang event page was created by independent contractors Kris Jane Mangaron and Emma Simms to report on Carlos Santana coming to Al Lang Stadium in Saint Petersburg, Florida. (Doc. # 51-1 at Conlon Aff. at ¶¶ 19-20; Doc. # 7-10; Doc. # 53-1 at Conlon Dep. at 31:11-32:10, 44:16-25). Emma Simms was paid

$15.00 by MyArea for the article that was published with the Santana photograph. (Doc. # 51-1 at Conlon Aff. at ¶ 20).

The Santana at Al Lang event page listed details surrounding Carlos Santana coming to perform at Al Lang Stadium. (Doc. # 7-10). The Santana at Al Lang event page included an altered version of the Santana photograph. (Id.). Specifically, a majority of the background was cropped and a banner with text announcing Santana's presence was placed at the bottom of the cropped image. (Id.; Doc. # 60-1 at Philpot Dep. at 71:8-24). The Santana at Al Lang event did not contain any commentary or criticism of the Santana photograph itself. (Doc. # 53-1 at Philpot Decl. at ¶ 54; Doc. # 53-1 at Conlon Dep. at 32:20-23, 43:23-44:2). Rather, according to Conlon, the purpose of the article and its use was "for news reporting and commentary on issues of public concern." (Doc. # 51-1 at Conlon Aff. at ¶¶ 2, 3, 4, 6, 10; Doc. # 53-1 at Conlon Dep. at 23:13-21, 29:17-18, 29:22-30:4, 140:18-23; 143:3-18).

Philpot learned of MyArea's display of the Santana photograph around May 19, 2020. (Doc. # 60-1 at Philpot Dep. at 69:25-70:7). But Philpot did not request MyArea to take down the photograph nor contact MyArea about its display of the photograph. (Id. at 71:4-6).

Instead, MyArea first received notice of the alleged infringement of the Santana photograph upon receipt of the complaint in this case. (Doc. # 51-1 at Conlon Aff. at ¶ 21). "Immediately upon receipt of notice of this lawsuit, [MyArea] removed the image of Carlos Santana from the 727 Website." (Id. at ¶ 22).

MyArea has never charged a visitor to the 727 Website for access to the Santana at Al Lang event page. (Id. at ¶ 23). From April 2019, through May 29, 2020, MyArea generated $3.46 in revenue from advertisements run on the webpage displaying the Santana at Al Lang event page. (Id. at ¶ 24).

### E.  **Procedural History**

Philpot initiated this case on May 29, 2020, asserting a claim for copyright infringement against MyArea. (Doc. # 1). MyArea filed its answer and affirmative defenses on August 24, 2020. (Doc. # 25). The case proceeded through discovery.

Now, Philpot and MyArea both move for summary judgment. (Doc. ## 51, 53). The Motions are briefed (Doc. ## 56, 60, 65), and are ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue

for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-

39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

## III. **Analysis**

MyArea moves for summary judgment on its affirmative defense of fair use. (Doc. # 51). In contrast, in his Motion for Partial Summary Judgment (Doc. # 53), Philpot argues that MyArea's use of his photographs was not fair use and that none of MyArea's other affirmative defenses listed in its answer apply.

The Court will begin its analysis with MyArea's Motion.

### A. **MyArea's Motion**[1]

"Fair use is a defense that can excuse what would otherwise be an infringing use of copyrighted material." Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1238 (11th Cir. 2014)(citing 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of

---

[1] Philpot is correct that MyArea's Motion impermissibly exceeds the page limit set by Local Rule 3.01(a). (Doc. # 56 at 8). Nevertheless, in the interest of resolving motions on the merits, the Court declines to strike MyArea's Motion.

copyright.")). "To prevail on a claim of fair use, a defendant must convince the court that allowing his or her unpaid use of copyrighted material would be equitable and consonant with the purposes of copyright." Id. "In order to make this determination, the court must carefully evaluate the facts of the case at hand in light of four considerations, which are codified in the Copyright Act of 1976: (1) the purpose of the allegedly infringing use, (2) the nature of the original work, (3) the size and significance of the portion of the original work that was copied, and (4) the effect of the allegedly infringing use on the potential market for or value of the original." Id.

"These factors establish the contours within which a court may investigate whether, in a given case, a finding of fair use would serve the objectives of copyright." Id. "[A] given factor may be more or less important in determining whether a particular use should be considered fair under the specific circumstances of the case" and the factors should not be added up mechanically to determine fair use. Id. at 1260. "Fair use involves both questions of law and questions of fact." Id. at 1255. "The fair use analysis must be performed on a case-by-case/work-by-work basis." Id. at 1271-72.

### 1. **Factor One**

"The first fair use factor is 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" Id. at 1261 (quoting 17 U.S.C. § 107(1)). "The inquiry under the first factor has several facets, including (1) the extent to which the use is a 'transformative' rather than merely superseding use of the original work and (2) whether the use is for a nonprofit educational purpose, as opposed to a commercial purpose." Id.

The "initial inquiry under the first factor asks whether [MyArea's] use is transformative, i.e., 'whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" Id. at 1262 (citation omitted). "A nontransformative use, on the other hand, is one which serves the same 'overall function' as the original work." Id. The Eleventh Circuit has advised that "[e]ven verbatim copying 'may be transformative so long as the copy serves a different function than the original work.'" Id. (quoting Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007)).

MyArea argues that its use of the Nelson and Santana photographs was transformative because its use of the photographs "added something new." (Doc. # 51 at 18). It argues that "[at] the time they were taken, Philpot intended to capture musicians at concert in some creative manner to capture [the musician's] personality during a great moment in time." (Id.). According to MyArea, Philpot's purpose in taking the photographs is different from the purpose of the photographs in the articles — "to allow [MyArea's] users to report on a local newsworthy event" and for "news reporting and commentary on issues and events of local public interest." (Id. at 19-20). Additionally, MyArea emphasizes that the Santana photograph was altered to some extent — "a majority of the photograph has been cropped out, and a large banner has been inserted with text reciting the headline" — suggesting that its use was transformative. (Id. at 19).

The Court disagrees. Taking the evidence in the light most favorable to Philpot, MyArea's use of the photographs was not transformative. A reasonable jury could conclude that the photographs served the same purpose in the articles as when Philpot created them. See Brammer v. Violent Hues Prods., LLC, 922 F.3d 255, 264 (4th Cir. 2019)("Violent Hues used the Photo expressly for its content — that is, to depict [the

neighborhood of] Adams Morgan — rather than for data organization or historical preservation. Instead, Violent Hues' sole claim to transformation is that its secondary use of the Photo provided film festival attendees with 'information' regarding Adams Morgan. But such a use does not necessarily create a new function or meaning that expands human thought; if this were so, virtually all illustrative uses of photography would qualify as transformative."); see also Philpot v. WOS, Inc., No. 1:18-CV-339-RP, 2019 WL 1767208, at *5 (W.D. Tex. Apr. 22, 2019)("This disagreement about how to characterize Philpot's purpose and WOS's is a fact issue for a jury. For purposes of deciding WOS's motion, the Court finds that a reasonable jury could conclude that both parties used the Chesney and Nelson photos for the same purpose. When, as here, a work is reproduced exactly for the same purpose, the use is not transformative. Viewing the facts in the light most favorable to Philpot, this factor weighs in his favor." (citations omitted)). Indeed, according to Philpot's declaration, the purpose of both photographs was "to identify" the musician depicted. (Doc. # 53-1 at Philpot Decl. at ¶¶ 7, 16)

While MyArea argues the photographs were transformed because they were used for news and commentary, this argument

is unpersuasive when taking the evidence in the light most favorable to Philpot because the articles did not provide commentary or criticism of the photographs themselves. See Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017)("Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about* that work. For instance, a news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about. Similarly, a depiction of a controversial photograph might fairly accompany a work of commentary or criticism about the artistic merit or appropriateness of the photograph. In each such case, the copyrighted work is itself the subject of the story, transforming the function of the work in the new context." (citations omitted)). Additionally, the fact that the Nelson photograph was not altered and the Santana photograph was merely cropped with a banner added to the bottom with Santana's face still visible weigh against finding that the use was not transformative. See Violent Hues Prods., LLC, 922 F.3d at 263 ("The only obvious change Violent Hues made to the Photo's content was to crop it so as to

remove negative space. This change does not alter the original with 'new expression, meaning or message.'").

Next, the Court must consider whether the use of the two photographs was commercial. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562 (1985).

Taking the evidence in the light most favorable to Philpot, MyArea's use of both the Nelson and Santana photographs was commercial. MyArea admits that it earned ad revenue from the articles including the Nelson and Santana photographs. (Doc. # 51-1 at Conlon Aff. at ¶¶ 17, 24). The fact that this ad revenue is small is irrelevant. See WOS, Inc., 2019 WL 1767208, at *4 ("There is no genuine dispute that WOS's use of Philpot's photos is commercial. WOS is a for-profit business that earns advertising revenue based on pageviews. WOS used Philpot's photos to drive traffic to its articles about Chesney and Nelson; that traffic earned the company revenue. Although WOS downplays its uses as 'nominally commercial' because the Chesney article brought in only $6.41, the question is whether WOS 'st[ood] to profit

21

from exploitation of the copyrighted material without paying the customary price' . . . and not whether WOS was especially successful at profiting from its exploitation. This subfactor tends to weigh against a finding of fair use but is far from dispositive." (citations and footnote omitted)).

In short, when viewing the evidence in the light most favorable to Philpot, the first factor weighs against fair use.

### 2. <u>Factor Two</u>

"The second fair use factor, 'the nature of the copyrighted work,' 17 U.S.C. § 107(2), 'calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" <u>Cambridge Univ. Press</u>, 769 F.3d at 1268 (citation omitted). "The inquiry under the second factor generally focuses on two criteria. First, because works that are highly creative are closer to the core of copyright — that is, such works contain the most originality and inventiveness — the law affords such works maximal protection, and hence it is less likely that use of such works will be fair use." <u>Id.</u> (citation and footnote omitted). "In contrast, '[t]he law generally recognizes a greater need to disseminate factual

works than works of fiction or fantasy,' and so it is more likely that the use of a factual or informational work will be fair use." Id. (citations omitted).

"[P]hotographs have varying degrees of creativity" and may have a "mixed nature of fact and creativity." Balsley v. LFP, Inc., 691 F.3d 747, 760 (6th Cir. 2012). "When creative judgments are apparent in a photograph — even if the purpose of the image is to document or convey factual information — courts tend to hold that the work is creative in nature." WOS, Inc., 2019 WL 1767208, at *5.

MyArea argues that this factor weighs "slightly" in favor of fair use because the photographs, which "merely capture a moment in time depicting Willie Nelson and Carlos Santana performing," are "arguably more factual than creative." (Doc. # 51 at 22). Additionally, MyArea emphasizes that it used the photographs "solely for identification purposes." (Id.).

But Philpot emphasizes the "several creative decisions, including selecting the subject matter, angle of photography, exposure, composition, framing, location, and exact moment of creation," he made in taking the Nelson and Santana photographs. (Doc. # 53-1 at Philpot Decl. at ¶¶ 8, 17). Thus, a reasonable jury could find that the Nelson and Santana

photographs reflect Philpot's artistic judgment such that they are creative works. See WOS, Inc., 2019 WL 1767208, at *5 (stating that "a reasonable jury could agree with Philpot that the Chesney and Nelson photos reflect Philpot's creative judgments about things like angle, framing, and timing," and thus finding, when taking all evidence in Philpot's favor, that this factor weighed against fair use). Taking the evidence in the light most favorable to Philpot, the photographs are minimally creative. This factor weighs slightly against a finding of fair use.

### 3.    Factor Three

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "[T]his third factor examines whether defendants have 'helped themselves overmuch' of the copyrighted work in light of the purpose and character of the use." Cambridge Univ. Press, 769 F.3d at 1271 (citation omitted). "Thus, this factor is intertwined with the first factor." Id. "[T]his factor is [also] intertwined with the fourth factor and partly functions as a heuristic to determine the impact on the market for the original." Id. (citation omitted).

In analyzing the third factor, courts "must consider 'not only . . . the quantity of the materials used, but . . . their quality and importance, too.'" Id. (citation omitted). "This factor 'weighs less when considering a photograph — where all or most of the work often must be used in order to preserve any meaning at all — than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." Katz v. Google Inc., 802 F.3d 1178, 1183–84 (11th Cir. 2015)(citation omitted).

Taking all evidence in the light most favorable to Philpot, MyArea copied the Nelson photograph in its entirety. "While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use." Kelly v. Arriba Soft Corp., 336 F.3d 811, 820 (9th Cir. 2003)(citation omitted). "That said, 'the extent of permissible copying varies with the purpose and character of the use.'" WOS, Inc., 2019 WL 1767208, at *6 (citation omitted)). "So, for example, courts have concluded that wholesale copying does not necessarily weigh against finding fair use when doing so is necessary to make a fair use of the image." Id. A reasonable jury could conclude that wholesale copying of the Nelson photograph was not necessary to make a fair use of the image. See Id. ("A reasonable jury could agree

25

with Philpot that the wholesale copying of his photos is not necessary to make fair use of the images."). Thus, this factor weighs against a finding of fair use as to the Nelson photograph.

Regarding the Santana photograph, MyArea cropped the photograph, such that it did not copy the entirety of the photograph. However, taking the evidence in the light most favorable to Philpot, a reasonable jury could find that the portion of the Santana photograph that MyArea copied is the heart of the work. See Friedman v. Guetta, No. CV 10-00014 DDP JCX, 2011 WL 3510890, at *7 (C.D. Cal. May 27, 2011)("Defendant downloaded an exact digital copy of the Photograph and used substantial portions of that photograph, including the three individuals' faces. . . . Defendant took a substantial portion of the Photograph in order to create each of the Four works, and the portion Defendant took was at the heart of the Photograph."). Indeed, MyArea used the portion of the Santana photograph depicting Santana's face, which a reasonable jury could find to be the most important feature of the photograph.

Thus, taking all evidence in the light most favorable to Philpot, this factor weighs against a finding of fair use.

## 4. **Factor Four**

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Courts "must consider two inquiries: (1) 'the extent of the market harm caused by the particular actions of the alleged infringer,' and (2) 'whether unrestricted and widespread conduct of the sort engaged in by the defendant [] would result in a substantially adverse impact on the potential market.'" Cambridge Univ. Press, 769 F.3d at 1275.

"The adverse impact [courts] are 'primarily concerned [with] is that of market substitution.'" Id. (citation omitted). "Furthermore, '[m]arket harm is a matter of degree, and the importance of [the fourth] factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors.'" Id. (citation omitted).

MyArea argues that this factor favors fair use because "Philpot cannot demonstrate that a market exists for his photographs or that he enjoyed a revenue stream from licensing his works." (Doc. # 51 at 25); see also Field v. Google Inc., 412 F. Supp. 2d 1106, 1121 (D. Nev. 2006)("Here there is no evidence of any market for Field's works. Field makes the works available to the public for free in their entirety, and

admits that he has never received any compensation from selling or licensing them. There is likewise no evidence that by displaying 'Cached' links for pages from Field's site, Google had any impact on any potential market for those works." (citation omitted)).

The Court agrees that, even taking the evidence in the light most favorable to Philpot, this factor weighs heavily in favor of fair use. True, "[b]ecause [MyArea's] use of Philpot's photos is commercial, this factor presumptively weighs in Philpot's favor." WOS, Inc., 2019 WL 1767208, at *6. Nevertheless, while Philpot believes his photographs have monetary value and that even attribution alone provides value, the fact that he offers the Nelson and Santana photographs for free with attribution undermines a finding of damage to a potential market, thereby overcoming the presumption. See Id. at *7 ("Although the Court accepts that attribution might lead someone to purchase one of Philpot's works, he fails to explain how any amount of advertisement might lead to being paid for two works that he makes available for free. So, while it is true that this factor contemplates not only actual but also potential market damage, there is no evidence that WOS's use will have any effect on the market for the Chesney or Nelson photos. Even viewing the evidence

in the light most favorable to Philpot, WOS has overcome the presumption that this factor weighs against a finding of fair use. This factor — the most important of the four — weighs in WOS's favor." (citation omitted)).

### 5. __Weighing the Factors__

Viewing the evidence in Philpot's favor, three of the four factors tilt in Philpot's favor, even if only slightly, while one very important factor weighs heavily in MyArea's favor.

Based on this breakdown, a reasonable jury could find that fair use does not apply. Thus, MyArea is not entitled to summary judgment on the fair use defense. See WOS, Inc., 2019 WL 1767208, at *7 ("When the evidence is viewed in Philpot's favor, three of the four factors tilt his direction. Meanwhile, the most important factor tilts against Philpot. Perhaps the final factor's weight is so great that WOS's use is fair, but that is not obviously the case — not so obvious, at any rate, that the Court can conclude that no reasonable jury could find to the contrary. WOS is not entitled to summary judgment on its fair use defense."); see also Philpot v. Toledo Radio, LLC, No. 3:15CV1401, 2016 WL 5118282, at *2 (N.D. Ohio Sept. 21, 2016)("After considering these factors in light of the evidence in the record, I cannot conclude

reasonable minds could come to but one conclusion concerning whether defendant's publication of the Nelson Photo constituted fair use. Thus, it is an issue for the trier of fact to decide.").

### B. **Philpot's Motion**

#### 1. **Fair Use**

Philpot also moves for summary judgment on MyArea's fair use defense. In analyzing the fair use defense now, the Court will take all evidence in the light most favorable to MyArea.[2]

##### i. **Factor One**

Again, "[t]he first fair use factor is 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" Cambridge Univ. Press, 769 F.3d at 1261 (quoting 17 U.S.C. § 107(1)). "The inquiry under the first factor has several facets, including (1) the extent to which the use is a 'transformative' rather than merely superseding use of the

---

[2] Philpot asks that the Court grant summary judgment on the issue of liability for his copyright infringement claim. (Doc. # 53 at 8-10). However, because the Court finds that certain of MyArea's affirmative defenses survive summary judgment, the Court will not rule at this time on whether Philpot has otherwise established the elements of his copyright infringement claim.

original work and (2) whether the use is for a nonprofit educational purpose, as opposed to a commercial purpose." Id.

Viewing the evidence in the light most favorable to MyArea, a reasonable jury could conclude the parties used the photographs for different purposes "because it could agree that [MyArea] used the photos in support of 'news commentary'" — albeit not commentary on the photographs themselves — "while Philpot's purpose was merely 'to depict the artists in concert.'" WOS, Inc., 2019 WL 1767208, at *9; (Doc. # 51-1 at Conlon Aff. at ¶¶ 2, 3, 4, 6, 10; Doc. # 53-1 at Conlon Dep. at 23:13-21, 29:17-18, 29:22-30:4, 140:18-23; 143:3-18). Based on this evidence, a reasonable jury could conclude that MyArea's use of the photographs was minimally transformative by adding a further purpose for the photographs. See WOS, Inc., 2019 WL 1767208, at *10 ("[T]he Court agrees with those courts that have held that when an infringer simply reproduces a work in a new context, the use is 'at best minimally transformative.'" (citation omitted)).

However, even taking the evidence in the light most favorable to MyArea, MyArea's use of the photographs was commercial. Although MyArea allows articles to be posted to its website in part "to support local residents and businesses to create synergy between individuals and their community,"

MyArea earns ad revenue from its articles, including the articles featuring the Nelson and Santana photographs. (Doc. # 51-1 at Conlon Aff. at ¶¶ 3, 17, 24). Thus, the use of the Nelson and Santana photographs — while not very profitable — was commercial.

Considered together, "[a] reasonable factfinder could conclude that this factor is either neutral or tilts slightly in either direction, depending on how much weight it gives [MyArea's] minimally transformative use." WOS, Inc., 2019 WL 1767208, at *10.

### ii. **Factor Two**

"The second fair use factor, 'the nature of the copyrighted work,' 17 U.S.C. § 107(2), 'calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" Cambridge Univ. Press, 769 F.3d at 1268 (citation omitted). "Presented with photographs that are 'not designed primarily to express [the photographer's] ideas, emotions, or feelings,' courts have found that the impact on the fair-use inquiry to be neutral." WOS, Inc., 2019 WL 1767208, at *10 (citation omitted).

Here, a reasonable jury could find that the photographs are so factual as to be only "marginally creative" given that Philpot declared the purpose of the photographs was to identify Nelson and Santana. See Id. ("Notwithstanding Philpot's emphasis on the creative decisions he made crafting these two photos, a reasonable jury could find that these photos — taken with an admittedly non-artistic aim (to identify) — are so factual as to be considered 'marginally creative.'" (citation omitted)). Therefore, taking all evidence in the light most favorable to MyArea, this factor is neutral.

### iii. **Factor Three**

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).

Here, the Nelson photograph was used in nearly its entirety while the Santana photograph was cropped and had a banner added to the bottom — changes that did not obscure Santana's face. Even taking the evidence in the light most favorable to MyArea, there is no evidence that MyArea needed to use the entirety of the Nelson photograph or such a prominent portion of the Santana photograph.

Nevertheless, the Court is mindful that "[t]his factor 'weighs less when considering a photograph — where all or most of the work often must be used in order to preserve any meaning at all — than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." Katz, 802 F.3d at 1183–84 (citation omitted).

Thus, this factor only weighs slightly against a finding of fair use.

### iv. **Factor Four**

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Now, taking the evidence in the light most favorable to MyArea, the Court again finds that a reasonable jury could conclude that MyArea's use of the photographs has had no effect on the potential market or value of Philpot's photographs.

Thus, this factor weighs heavily in favor of fair use. See WOS, Inc., 2019 WL 1767208, at *10 ("[A] reasonable jury could conclude that there is no market for the Chesney and Nelson photos and that WOS's failure to properly attribute those photos has not damaged any potential market for those photos. This factor weighs heavily in WOS's favor.").

### v.    **Weighing the Factors**

Taking all evidence in the light most favorable to MyArea, one factor weighs heavily in favor of fair use, while two are likely neutral, and one factor weighs slightly against fair use. A reasonable jury could conclude that MyArea's use of both the Nelson and Santana photographs was fair under these circumstances. Thus, Philpot's Motion is denied as to the fair use defense.

### 2.    **Innocent Infringer**

Section 504(c)(2) provides that

> In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

17 U.S.C. § 504(c)(2).

Philpot seeks summary judgment to the extent MyArea may argue that it is an innocent infringer under Section 504(c)(2). (Doc. # 53 at 10). According to Philpot, "MyArea [] testified that it had no evidence that it acted accidentally or intentionally when it published both the Willie Nelson and Carlos Santana Photos." (Id. at 10-11).

The deposition testimony to which Philpot refers is as follows:

Q:   As you sit here today, you don't know whether [Alex Koch's] posting of the Willie Nelson photo was accidental or intentional or otherwise?

A:   Yes.

. . .

Q:   . . . [A]s far as your direct knowledge, of Kris Mangaron's —

A:   I did not have direct communication with Kris if that helps to clarify.

Q:   Okay. And so you don't know directly what was in her brain when she posted the photos. Is that correct?

A:   That is correct.

(Doc. # 53-1 at Conlon Dep. at 94:13-16, 96:25-97:7).

But MyArea argues this testimony makes it clear that (1) MyArea did not create the two articles and (2) had no knowledge of the mental state and intentions of the individuals who created the articles and input the photographs. (Doc. # 62 at 9-12). Additionally, Conlon testified that MyArea had no intention to infringe any copyrights: "We have the intention of — of, you know, sharing information and being, you know, the source for where to find things to do in an area. That's an intention. But certainly we would not intend to infringe on anybody's copyrights or — or — end productions." (Doc. # 53-1 at Conlon Dep. at 139:14-20).

Given this testimony, the Court finds that a genuine issue of material fact exists regarding whether MyArea was an innocent infringer. Indeed, a reasonable jury could credit this testimony and find that MyArea innocently infringed. Thus, the Motion is denied as to this defense.

### 3. Failure to State a Claim Affirmative Defense

MyArea's first affirmative defense listed in its answer states: "Plaintiff's Complaint, and each cause of action therein, fails to state a claim upon which relief may be granted." (Doc. # 25 at 7).

Philpot moves for summary judgment, arguing that "the failure to state a claim upon which relief can be granted is not an affirmative defense" and, regardless, the complaint does state a claim for copyright infringement. (Doc. # 53 at 11).

The Court agrees that MyArea's first affirmative defense is not an affirmative defense at all as it merely denies Philpot's prima facie case. See In re Rawson Food Serv., Inc., 846 F.2d 1343, 1349 (11th Cir. 1988)("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."); Gomez v. Bird Auto., LLC, 411 F. Supp. 3d 1332, 1338 (S.D. Fla. 2019)("For example, responding that plaintiff's complaint fails to state a claim upon which relief

may be granted — the standard for dismissal under Rule 12(b)(6) — . . . does not raise an affirmative defense." (citation omitted)).

But, because the failure to state a claim is not an affirmative defense, there is no need to grant summary judgment on it as though it is an affirmative defense. Rather, the Court may just treat this as a denial by MyArea that Philpot will be able to triumph on his claims when the case proceeds to trial. See Home Mgmt. Sols., Inc. v. Prescient, Inc., No. 07-20608-CIV, 2007 WL 2412834, at *3 (S.D. Fla. Aug. 21, 2007)(explaining in the context of a motion to strike affirmative defenses that, when a defendant labels a negative averment as an affirmative defense, "the proper remedy is not [to] strike the claim, but rather to treat is as a specific denial"). Accordingly, the Motion is denied as to this argument.

### 4. <u>Failure to Sustain Harm Affirmative Defense</u>

In its second affirmative defense, MyArea states "Plaintiff has sustained no harm, irreparable or otherwise, due to Defendant's actions." (Doc. # 25 at 7).

Philpot argues that summary judgment should be granted on this defense because he incurred actual damages "by losing out on a $3,500.00 license for each of the photos" and not

having his name attributed with the photographs. (Doc. # 53 at 18).

The Motion is denied. Taking the evidence in the light most favorable to MyArea, genuine issues of material fact exist regarding the extent and nature of any harm Philpot may have suffered as a result of MyArea's use of the photographs. There is evidence that Philpot was never paid — outside of the infringement action context — for the Nelson and Santana photographs. And, indeed, Philpot offers the photographs on Wikimedia subject to CCLs that require only attribution. The parties also disagree over the value attribution provides.

Thus, a reasonable jury could conclude that Philpot has not sustained harm as a result of MyArea's action. This affirmative defense must proceed to trial.

### 5.   **Affirmative Defense regarding Attorney's Fees**

Next, Philpot argues that he is entitled to summary judgment on MyArea's third affirmative defense, which states that "[MyArea] has not engaged in any conduct that would make this an exceptional case or that would entitle [Philpot] to an award of [his] reasonable attorneys' fees." (Doc. # 25 at 7). This is not a true affirmative defense, as it merely denies the complaint's request for attorney's fees, and

summary judgment should not be granted on it as though it were an affirmative defense.

Furthermore, as liability has not yet been established, Philpot is not yet a prevailing party in this case. See 17 U.S.C. § 505 ("[T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs."). Thus, because he is not entitled to attorney's fees at this juncture, any analysis under the exceptional case standard is premature.

The Motion is denied to the extent it seeks summary judgment in Philpot's favor on this supposed affirmative defense. As far as Philpot's disagreement over the applicability of the exceptional case standard in general, he may raise this issue later in the case, if necessary.

6. **Affirmative Defense of Acquiescence, Laches, Estoppel, and Statute of Limitations**

In its fifth affirmative defense, MyArea asserts the affirmative defenses of acquiescence, laches, estoppel, and the statute of limitations. (Doc. # 25 at 8).

Philpot persuasively argues that none of these defenses have merit in this case. Regarding acquiescence, Philpot argues the defense is inapplicable because "Philpot never offered either the Willie Nelson or Carlos Santana Photos for

free — rather, he offered them for a paid license or for a [CCL] which requires attribution." (Doc. # 53 at 19); see Malibu Media, LLC v. Zumbo, No. 2:13-cv-729-JES-DNF, 2014 WL 2742830, at *3 (M.D. Fla. June 17, 2014)("[A]cquiescence requires that: (1) [Plaintiff] actively represented that [he] would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." (citation and internal quotation marks omitted)).

Next, regarding laches and the statute of limitations, Philpot argues that he "clearly brought this lawsuit within the three-year statute of limitations period for both photos." (Doc. # 53 at 20); see Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 667 (2014)("To the extent that an infringement suit seeks relief solely for conduct occurring within the limitations period, however, courts are not at liberty to jettison Congress' judgment on the timeliness of suit. Laches, we hold, cannot be invoked to preclude adjudication of a claim for damages brought within the three-year window."). Indeed, Philpot initiated this action on May 29, 2020, a little over a year after MyArea posted the article with the Santana photograph and just under three years after

41

Philpot discovered the article with the Nelson photograph on May 30, 2017. (Doc. # 53 at 22-23; Doc. # 53-1 at Philpot Decl. at ¶ 26); <u>see</u> <u>also</u> <u>Duncanson v. Wathen</u>, No. 6:14-cv-704-PGB-KRS, 2016 WL 7319714, at *2 (M.D. Fla. Apr. 14, 2016)("Under the majority position, referred to as the discovery rule, a copyright infringement cause of action accrues when a copyright owner knew or should have known of the alleged infringement. Under the minority position, referred to as the injury rule, the statute of limitations begins to run when the alleged infringement occurred. While the Eleventh Circuit has not explicitly adopted either position, other Middle District of Florida courts have held that the discovery rule controls." (citations and internal quotation marks omitted)).

Finally, regarding estoppel, Philpot argues that there is no evidence to support any of the elements of an estoppel defense. See <u>Thornton v. J Jargon Co.</u>, 580 F. Supp. 2d 1261, 1282 (M.D. Fla. 2008)("In copyright infringement actions, an alleged infringer may assert the defense of estoppel by demonstrating that: (1) the copyright owner knew the facts of the infringement, (2) the copyright owner intended its conduct to be acted upon or the copyright owner acted such that the alleged infringer has a right to believe it was so

intended, (3) the alleged infringer is ignorant of the true facts, and (4) the alleged infringer relies on the copyright owner's conduct to his detriment." (citation and internal quotation marks omitted)). Specifically, Philpot highlights Conlon's deposition testimony that Philpot was not in contact with MyArea before MyArea used Philpot's photographs, such that MyArea did not act in reliance on any representation by Philpot. (Doc. # 53-1 at Conlon Dep. at 36:25-37:3, 100:5-18).

MyArea has failed to respond regarding these defenses. Thus, MyArea has abandoned its fifth affirmative defense. See Powell v. Am. Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014)("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015). Because the Court agrees with Philpot that no genuine disputes of material fact exist as to acquiescence, laches, estoppel, and the statute of limitations, the Court grants summary judgment on the fifth affirmative defense.

## 7.   <u>De Minimis Use Affirmative Defense</u>

MyArea's sixth affirmative defense states that the complaint "is barred by the doctrine of de [minimis] use." (Doc. # 25 at 8).

"There is no infringement if the portion of the copyrighted work actually taken is not entitled to copyright protection." <u>EarthCam, Inc. v. OxBlue Corp.</u>, 49 F. Supp. 3d 1210, 1232 (N.D. Ga. 2014), <u>aff'd</u>, 703 F. App'x 803 (11th Cir. 2017). In other words, in "some cases, the amount of material copied will be so small as to be *de minimis,* and will not justify a finding of substantial similarity." <u>MiTek Holdings, Inc. v. Arce Eng'g Co.</u>, 89 F.3d 1548, 1560 (11th Cir. 1996)(citation omitted). "The *de minimis* doctrine provides that the law does not impose legal consequences when unauthorized copying is sufficiently trivial." <u>EarthCam, Inc.</u>, 49 F. Supp. 3d at 1232.

"In determining whether the allegedly infringing work falls below the quantitative threshold of substantial similarity to the copyrighted work, courts often look to the amount of the copyrighted work that was copied, as well as, (in cases involving visual works), the observability of the copyrighted work in the allegedly infringing work." <u>Lagassey v. Roy</u>, No. 14-14303-CIV, 2017 WL 1397410, at *3 (S.D. Fla.

Jan. 31, 2017)(citing <u>Ringgold v. Black Ent. Television, Inc.</u>, 126 F.3d 70, 75 (2d Cir. 1997)). "Observability is determined by the length of time the copyrighted work appears in the allegedly infringing work, and its prominence in that work as revealed by the lighting and positioning of the copyrighted work." <u>Id.</u> "The next step in assessing Defendant's *de minimis* defense is to examine the qualitative significance of the amount copied to the copyrighted work as a whole." <u>Id.</u> at *4.

Philpot argues that summary judgment on this affirmative defense is appropriate because "there is no dispute that MyArea Network did not copy a qualitatively insubstantial portion of either the Willie Nelson or Carlos Santana Photos." (Doc. # 53 at 25).

Despite MyArea's arguments to the contrary, the Court finds that no reasonable jury could conclude that MyArea's use of the Nelson and Santana photographs was de minimis. Even taking all evidence in the light most favorable to MyArea, the photographs were heavily copied. MyArea made essentially no changes to the Nelson photograph and used a cropped but nevertheless recognizable portion of the Santana photograph, including Santana's face. Additionally, although the photographs were used in conjunction with articles

describing upcoming events, the photographs were prominently featured and observable at the top of the articles. Thus, the Motion is granted as to the sixth affirmative defense.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant MyArea Network, Inc.'s Motion for Summary Judgment (Doc. # 51) is **DENIED.**

(2)  Plaintiff Larry G. Philpot's Motion for Partial Summary Judgment (Doc. # 53) is **GRANTED** in part and **DENIED** in part. Summary judgment is granted only on MyArea's fifth and sixth affirmative defenses. Summary judgment is denied in all other respects.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>28th</u> day of June, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE